**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

DERIK VILLEDA-MORALES,
*Prisoner Identification No. 361700,*

    Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,
DR. TESSEMA,
P.A. CRYSTAL JAMISON,
DR. AVA JOUBERT-CURTIS,[1]
DR. MAHBOOBEH MEMARSADEGHI,
B. BONNER, *Nurse Manager,*
TERESA FOLK, *RN ADON,*
DR. MEMAR, and
P. HIHEUBA,

    Defendants.

Civil Action No. TDC-17-0566

**MEMORANDUM OPINION**

Plaintiff Derik Villeda-Morales, currently incarcerated at the Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland, has filed suit under 42 U.S.C. § 1983 alleging that Defendants Wexford Health Sources, Inc. ("Wexford"), RCI's contracted medical services provider; Dr. Tessema; Physician's Assistant ("P.A.") Crystal Jamison; Dr. Ava Joubert-Curtis; Dr. Mahboobeh Memarsadeghi; B. Bonner, a Nurse Manager; Registered Nurse ("R.N." or "Nurse") Teresa Folk; Dr. Memar; and P. Hiheuba were deliberately indifferent to his medical needs stemming from chronic joint pain, in violation of his rights under the Eighth Amendment to the United States Constitution. Presently pending before the Court is a Motion to Dismiss, or,

---

[1] Villeda-Morales named "Wexford Health Sources" and "Dr. Joubert" as Defendants. The Clerk shall amend the docket to reflect the correct name of these Defendants as "Wexford Health Sources, Inc." and "Dr. Ava Joubert-Curtis."

in the Alternative, Motion for Summary Judgment filed by Defendants Wexford, Tessema, Jamison, Joubert-Curtis, Folk, and Memarsadeghi (collectively, "the Medical Defendants"). Service of process was not properly effected on Defendants Bonner, Memar, or Hihueba because Wexford has not been able to identify these individuals. Villeda-Morales has also filed a Motion for Appointment of Counsel. No hearing is necessary to resolve these motions. *See* D. Md. Local R. 105.6 (2016). For the reasons set forth below, the Medical Defendants' Motion is GRANTED. Villeda-Morales's Motion for Appointment of Counsel is DENIED.

## BACKGROUND

On September 24, 2015, Villeda-Morales was evaluated by Dr. Colin Ottey in the RCI Chronic Care Clinic ("CCC"). Villeda-Morales reported that he had bilateral pain in his wrists, elbows, shoulders, and ankles, and stiffness in his joints. He was diagnosed with "arthritis with Reiter's Disease." Med. Records at 1, Mot. Dismiss Ex. 1, ECF No. 14-4.[2] Reiter's Disease, or Reiter's Syndrome, is a form of arthritis caused by an infection. Villeda-Morales was prescribed the medications Mobic (Meloxicam) and Glucosamine Chondroitin to address his pain and inflammation.

On November 20, 2015, Villeda-Morales complained of shoulder pain to Carmen Griffith, R.N. Nurse Griffith noted that the condition was chronic, that Villeda-Morales had been diagnosed with Reiter's Disease, and directed him to continue taking his prescribed medications and submit a sick-call slip if the medications did not address his pain. He was sent back to his housing unit in stable condition. Three days later, on November 23, 2015, he again visited Nurse Griffith because of his shoulder pain. Nurse Griffith's report described Villeda-Morales's skin as "dry, warm and intact," with no evidence of swelling or infection. Med.

---

[2] The cited page numbers for this exhibit are the numbers assigned by the Court's CM/ECF System.

Records at 6. Nurse Griffith told him to continue to take the prescribed Mobic and to use hot compresses for pain. On December 24, 2015, Villeda-Morales, during an examination in the CCC by Dr. Monica Stallworth, reported good symptom relief from his current medication for arthritis and requested refills.

On April 25, 2016, Villeda-Morales had a medical visit with Deborah Keller, R.N. and complained of left shoulder pain. He described his pain as "9/10" and stated that he had experienced pain for two years, but that it had worsened over the past month. *Id.* at 10. At that time, Villeda-Morales did not have full range of motion. Five days later, on April 30, he visited Nurse Keller again and stated that he believed his shoulder was dislocated. His range of motion was within normal limits. Nurse Keller assessed his injury as related to a shoulder strain or sprain and directed Villeda-Morales to continue taking his medications.

On May 22, 2016, Villeda-Morales was examined by Susan Myers, R.N. and complained of "strains, sprains [and] minor trauma." *Id.* at 13. His chief concern was pain in his left shoulder. Nurse Myers found the area over his anterior left clavicle to be tender. She recommended the immobilization of the injury, either a sprain or strain, with an elastic bandage or splint, heat applications, and ice or cool compresses as needed. Six days later, on May 28, Villeda-Morales again visited Nurse Griffith and complained of "left shoulder pain and bone buildup." *Id.* at 18. Nurse Griffith found that on the "bones on each acromion process," the "outside edge of bones" were "protruding," and the "right wrist bones" were "protruding." *Id.* He was referred to a physician.

On June 2, 2016, Dr. Ava Joubert-Curtis examined Villeda-Morales. Villeda-Morales reported that his shoulders were "aching." Dr. Joubert-Curtis noted that Villeda-Morales was "formerly heavy into weight lifting." *Id.* at 22. She diagnosed him with bilateral shoulder pain

of moderate severity and mildly reduced range of motion. Dr. Joubert-Curtis advised Villeda-Morales to take Mobic, to discontinue bench pressing, and to perform previously prescribed shoulder mobility exercises. An x-ray was ordered, and a follow-up examination was scheduled for one month later. On June 8, 2016, a right shoulder x-ray was taken but revealed no evidence of acute fracture, dislocation, or subluxation.

During a chronic care visit on June 10, 2016, Dr. Belay Tessema discussed the x-ray results with Villeda-Morales and noted that Villeda-Morales had no joint swelling and good shoulder mobility. Dr. Tessema observed that the left shoulder showed osteoarthritis, while the right shoulder was normal. Dr. Tessema changed Villeda-Morales's Mobic prescription to Naproxen and continued his prescription for Glucosamine Chondroitin. On June 14, 2016, Villeda-Morales visited Nurse Myers because he had not yet received his Naproxen. He received the Naproxen on June 17, 2016. On June 18, 2016, Dr. Stallworth reviewed his x-ray results with him and advised him to avoid weightlifting. However, on June 30, 2016, Villeda-Morales reported that "his right shoulder is hurting the same way the left shoulder pain started out" and that "the naproxen is not helping." *Id.* at 31.

Villeda-Morales continued to go to medical appointments because of his shoulder pain. On July 13, 2016, P.A. Crystal Jamison, noted that the left shoulder x-ray reflected a degenerative joint disease in Villeda-Morales's left acromioclavicular ("AC") joint. Villeda-Morales requested a trial Kenalog (corticosteroid) injection, which he received on August 15, 2016. Four days later, on August 19, Villeda-Morales reported that the shoulder area that was originally painful was better, but that he still had mild discomfort. However, by August 24, 2016, he complained to Kim Morrison, R.N. that he had sharp pain at the site of the injection.

4

Nurse Morrison discussed heat and cold therapies with Villeda-Morales and referred him for further evaluation.

On September 8, 2016, Villeda-Morales was examined by P.A. Jamison for continued right shoulder pain. P.A. Jamison requested additional x-rays, which revealed no acute fracture, but did reveal a seven-millimeter left AC joint separation. On September 29, 2016, Villeda-Morales told Marion Diaz, R.N. that he could not sleep at night because of the shoulder pain. On October 7, 2016, Villeda-Morales was examined by Harlan Woodward, R.N., who noted a clicking sound in Villeda-Morales's clavicle and shoulder. After another visit with a nurse on October 27, 2016, Villeda-Morales was seen in the CCC by Dr. Mahboobeh Memarsadeghi on November 7, 2016. After noting the September 2016 x-ray results, including the "remarkable" seven-millimeter separation of the left AC joint, Dr. Memarsadeghi ordered a consultation with an orthopedic specialist. *Id.* at 56.

On December 2, 2016, Villeda-Morales met with Dr. Manning, the orthopedic specialist. Dr. Manning noted that Villeda-Morales had experienced two years of shoulder pain since lifting weights. Dr. Manning diagnosed Villeda-Morales as having a Grade II AC sprain, directed a physical therapy program to strengthen his right and left shoulders, prescribed a nonsteroidal anti-inflammatory drug ("NSAID") gel to be applied to each shoulder, and ordered additional x-rays and a follow-up orthopedic evaluation after the completion of physical therapy.

On January 10, 2017, the RCI pharmacy declined to provide the NSAID gel prescribed by Dr. Manning and recommended a capsaicin ointment instead. On January 16, 2017, Villeda-Morales became angry and was asked to leave the RCI dispensary when he was told that his medication had been declined. On January 25, 2017, however, pursuant to a request from Dr. Memarsadeghi, the pharmacy approved the NSAID gel.

Villeda-Morales was evaluated for physical therapy on January 17, 2017. The physical therapist, Stephen D. Ryan, defined the goals of the physical therapy program as increasing the strength of left shoulder stabilizers and establishing a self-management program. Villeda-Morales underwent physical therapy sessions throughout January and into February 2017. Approximately three weeks after his last physical therapy session, Villeda-Morales requested a consult with the "bone doctor" and became upset when RCI medical staff refused to provide him with the exact date of his appointment. *Id.* at 78. After Villeda-Morales again requested, on March 12, 2017, to see an orthopedist, the consultation was ordered on March 24, 2017. On April 5, 2017, P.A. Jamison noted that the physical therapist had not yet conducted a post-therapy evaluation of Villeda-Morales. That evaluation was scheduled for the following week, to be followed by a "possible referral back to Dr. Manning per his request after completion of physical therapy." *Id.* at 82.

Over time, Villeda-Morales submitted various complaints about his medical treatment to RCI officials through the Administrative Remedy Procedure ("ARPs") and informal letters. On May 23, 2016, Villeda-Morales stated in an ARP that he was having trouble with his shoulder, that he was in "an enormous amount of pain," and that multiple visits to medical care providers had not helped his condition. Opp'n Mot. Dismiss at 5, ECF No. 18. On June 17, 2016, Villeda-Morales sent an informal letter to the Warden of RCI, which resulted in a referral by the Warden to the medical department with the note "left shoulder looks like bone is popped out of joint or socket." Opp'n Mot. Dismiss at 4. A week later, on June 23, 2016, Villeda-Morales filed another ARP describing his "severe shoulder injury," and stating that "the bone is protruding through the skin." *Id.* at 3. Villeda-Morales further complained in a July 15, 2016 ARP that, although he was physically permitted to go to the prison dispensary, the RCI medical staff

refused to do anything to treat his pain or injury. Finally, in an August 2, 2016 letter to the Assistant Warden, Villeda-Morales described his injury as "very painful." *Id.* at 4. It is not clear what response, if any, Villeda-Morales received from RCI officials as a result of these complaints.

In the opinion of Dr. Memarsadeghi, who has reviewed Villeda-Morales's medical records, Villeda-Morales "may have a chronic autoimmune or arthritic condition" and "is not, and may never be, definitively diagnosed, and may or may not be susceptible to a cure." Memarsadeghi Aff. ¶ 4, Mot. Dismiss Ex. 2, ECF No. 14-5. He further stated that Villeda-Morales is "in chronic care for pain management," and there "is no medical guaranty that [he] will ever be pain free." *Id.* Dr. Memarsadeghi further asserted that "to a reasonable degree of medical probability," Villeda-Morales's pain medication and strengthening exercises "are appropriate medical care for his bilateral shoulder joint condition." *Id.* ¶ 10.

On February 27, 2017, Villeda-Morales filed suit in this Court under 42 U.S.C. § 1983, asserting that the treatment that Defendants have provided for his shoulder pain has been so inadequate that it amounts to deliberate indifference to a serious medical condition, in violation of his right under the Eighth Amendment to be free from cruel and unusual punishment. Villeda-Morales seeks $1,000,000 in compensatory damages, an unspecified amount of punitive damages, and injunctive relief in the form of changes to how Maryland handles complaints by prisoners regarding medical treatment.

## DISCUSSION

### I. Motion for Appointment of Counsel

The Court first addresses Villeda-Morales's Motion for Appointment of Counsel. In this Motion, Villeda-Morales states that he is indigent, lacks knowledge of the law and the complex

medical issues relevant to his case, and requires the assistance of counsel to conduct discovery and examine witnesses at trial. A federal district court may appoint counsel when an indigent claimant presents exceptional circumstances. 28 U.S.C. § 1915(e)(1) (2012); *see Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). Exceptional circumstances include a litigant who "is barely able to read or write," *Whisenant v. Yuam*, 739 F.2d 160, 162 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. Of Iowa*, 490 U.S. 296 (1989), or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008).

Upon careful consideration of Villeda-Morales's filings, the Court finds that he has demonstrated the ability either to articulate the legal and factual basis of his claims himself or to secure meaningful assistance in doing so. Because no hearing is necessary to the disposition of this case, and there are no other exceptional circumstances that would warrant the appointment of an attorney, the Motion for Appointment of Counsel will be denied.

## II.  Motion to Dismiss

In their Motion to Dismiss or, in the Alternative, for Summary Judgment ("the Motion to Dismiss"), the Medical Defendants assert that Villeda-Morales's Complaint should be dismissed for several reasons. First, they state that the Complaint fails to state a cause of action against Wexford under 42 U.S.C. § 1983. Second, they argue that, based upon the undisputed material facts, they are entitled to judgment as a matter of law. Finally, they maintain that Villeda-Morales does not allege sufficient facts to support a claim for punitive damages.

## A. Wexford

In the Motion, the Medical Defendants seek dismissal of the claims against Wexford under Federal Rule of Civil Procedure 12(b)(6) on the grounds that Villeda-Morales has failed to state a plausible claim for relief under 42 U.S.C. 1983 against Wexford. To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Section 1983 allows individuals to sue in federal court any person who violates their federally protected rights while acting under color of law. 42 U.S.C. § 1983 (2012). The United States Supreme Court, in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), concluded that local government entities are considered "persons" for the purposes of § 1983, but they cannot be held liable solely because they employ an individual who committed an unlawful act. *Id.* at 690–91. Rather, local governments may be sued only if the constitutional violation alleged results from a custom or policy of the local government. *Id.* This standard also applies to private companies that employ individuals acting under color of state law, such as special police officers or prison medical personnel, who allegedly commit unlawful acts. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (citations omitted).

Thus, a company such as Wexford is liable under § 1983 "*only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Id.*

Here, the evidence establishes that Villeda-Morales received regular care for his joint pain, in the form of pain medication and physical therapy, and that in response to his continued complaints, he was referred for x-rays and eventually to an orthopedic specialist. Although Villeda-Morales may take issue with whether that treatment was adequate to address his condition, he has neither alleged nor asserted facts sufficient to support a claim that Wexford had an official policy or custom of not providing adequate medical care. Nor is there any evidence that Wexford had an official policy or custom of refusing to treat inmates for shoulder conditions or to refer them to specialists for such conditions. Villeda-Morales's claims against Wexford must therefore be dismissed.

B. **Individual Defendants**

1. **Legal Standard**

The remaining Medical Defendants claim that based on the submitted medical records and affidavit, they are entitled to judgment as a matter of law on the claims against them. In order to consider the exhibits submitted by the Medical Defendants, the Court must construe the Motion as one seeking summary judgment. Fed. R. Civ. P. 12(d). In his Memorandum in Opposition to the Motion, Villeda-Morales asserts that summary judgment is not appropriate at this time because no discovery has occurred. However, he does not identify any records or other evidence that must be obtained prior to consideration of summary judgment. Although Villeda-Morales states that the submitted medical records are incomplete, he does not specify what treatment or lack of treatment, if anything, is missing from the extensive materials already provided. Villeda-Morales also references various ARPs and other complaints about his medical

condition and treatment that he filed with RCI officials from May to October 2016, but he does not state that he lacks access to those ARPs and, indeed, summarizes them in his brief. Moreover, his description of his ARPs reveals that they provide Villeda-Morales's characterization of his symptoms, which are largely consistent with the medical records submitted by the Medical Defendants. *Compare, e.g.,* Opp'n Mot. Dismiss at 3 (noting that Villeda-Morales stated in a June 23, 2016 ARP that "this problem has been persistent for the past two years and has gotten worse within the last six (6) months") *with* Med. Records at 10 (noting in an April 25, 2016 medical report that Villeda-Morales reported his shoulder pain as a "9/10" and his "left shoulder pain x 2 years but worse over the past month"). For purposes of the Motion, reading Villeda-Morales's Opposition liberally, the Court will construe Villeda-Morales's characterization of the contents of those ARPs as part of the record to provide evidence on the nature of the complaints he registered with RCI. Where Villeda-Morales has not specified how discovery would shed light on the issue of deliberate indifference, and with the Court accepting, for purposes of the Motion, that Villeda-Morales filed the ARPs with the content described in his brief, the Court will construe the Motion as a motion for summary judgment and consider the exhibits. *See Strag v. Bd. of Trustees, Craven Comm. College*, 55 F.3d 943, 954 (4th Cir. 1995) (noting that requests for discovery before consideration of summary judgment are properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment"); *see also Gardner v. United States*, 184 F. Supp. 3d 175, 182-84 (D. Md. 2016) (denying a request for pre-summary judgment discovery where the requested discovery would not support a claim of deliberate indifference by medical providers).

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### 2. Eighth Amendment

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). To be "serious," the condition must be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 775 F.3d at 178 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson*, 775 F.3d at 178

(quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). Thus, a deliberate indifference claim has both an objective component—that there objectively exists a serious medical condition and an excessive risk to the inmate's health and safety—and a subjective component—that the official subjectively knew of the condition and risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1978) (holding that an official must have "knowledge" of a risk of harm, which must be "objectively, sufficiently serious").

Deliberate indifference is an "exacting standard" that requires more than a showing of "mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178; *Rich v. Bruce*, 129 F.3d 336, 339 (4th Cir. 1997) (finding that even when prison authorities are "too stupid" to realize the excessive risk their actions cause, there is no deliberate indifference). To constitute deliberate indifference to a serious medical need, the defendant's actions "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. "Questions of medical judgment are not subject to judicial review." *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

The Medical Defendants do not dispute that Villeda-Morales has a serious medical condition that requires treatment. They deny, however, that they failed to treat his osteoarthritis and shoulder sprain conditions adequately and therefore acted with "deliberate indifference" to a serious medical need. *See Estelle*, 429 U.S. at 104. A review of Villeda-Morales's medical records reveals that beginning in 2015, Villeda-Morales received regular care and medication for his chronic shoulder condition. Between September 2015 and April 2017, medical providers examined Villeda-Morales over 40 times, including sessions with doctors, physician's assistants, and registered nurses. Initially diagnosed with osteoarthritis and Reiter's Disease, he received a variety of medications, including Mobic, Glucosamine Chondroitin, Indocin, and Naproxen. He was advised to use, and was instructed on the use of, hot and cold compresses on his shoulder. He received a corticosteroid injection which provided short-term relief. When x-rays revealed a separation of his AC joint, he was referred to an orthopedic specialist, who recommended an NSAIDS gel, physical therapy, and a follow-up x-rays and consultation. He underwent a physical therapy regimen and continued to use NSAIDS oral and gel medications. The fact that the treatment has not eliminated Villeda-Morales's shoulder pain does not render his medical care constitutionally deficient, particularly in light of the uncontroverted medical opinion of Dr. Memarsadeghi that Villeda-Morales "may have a chronic autoimmune or arthritic condition" that "may not be susceptible to a cure." Memarsadeghi Aff. ¶ 4. Where the medical personnel were responsive to Villeda-Morales's requests to see them and employed a wide variety of treatment options, the Court finds no basis to support a finding of deliberate indifference to a serious medical need.

Even if his medical providers misdiagnosed his shoulder injury or prescribed ineffective treatment, such acts or omissions would not have established a deliberate indifference to a

serious medical need. *See Jackson*, 775 F.3d at 178 (stating that negligence and many acts or omissions that would constitute medical malpractice do not rise to the level of deliberate indifference absent actual knowledge of a substantial risk to inmate health that was deliberately disregarded); *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (stating that a claim of inadequate medical care amounting to malpractice was not sufficient to establish deliberate indifference). Likewise, the fact that Villeda-Morales disagrees with the course of treatment followed by his medical providers does not establish deliberate indifference, because "disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright*, 766 F.2d at 849.

This conclusion is not altered by Villeda-Morales's complaints submitted through his series of ARPs and letters to RCI officials. The vast majority of these complaints were comparable to those he registered with his medical providers, as referenced in the medical records, and were addressed in a constitutionally adequate manner, as discussed above. The only allegation he made that was arguably inconsistent with the medical records was his contention in a June 23, 2016 ARP that "the bone is protruding through the skin." Opp'n Mot. Dismiss at 3. The medical records, however, reveal no instance in which Villeda-Morales reported such a condition, or a medical provider observed such a condition. In the absence of evidence that any medical provider was aware of such a condition, there can be no deliberate indifference. *See* Maryland Div. of Correction, Inmate Handbook 30 (2007) (stating that ARPs are filed with the Warden); *Webb v. Hamidullah*, 281 F. App'x 159, 167-68 (4th Cir. 2008) (holding that a physician could not be deliberately indifferent as a result of the plaintiff's failure to receive an adequate medical device because the physician was not aware that the device was not received, even though an informal prison complaint had been filed to that effect); *Gobert v. Caldwell*, 463

F.3d 339, 350-52 (5th Cir. 2006) (finding no deliberate indifference when a physician was not aware that the plaintiff had not received needed antibiotics, even though the plaintiff had submitted an ARP to that effect).

More importantly, to the extent that Villeda-Morales's assertion could be construed as alleging that the bone had penetrated the skin, it is contradicted by Dr. Memarsadeghi's affidavit, which stated that "contrary to Plaintiff's complaint, the bones are not protruding through the skin." Memarsadeghi Aff. ¶ 5. Crucially, the x-ray results, which Villeda-Morales accepts for purposes of their conclusion that he had a seven-millimeter of the left AC joint, revealed no such condition. Thus, Nurse Griffith's May 28, 2016 notation that "outside edge of bones [are] protruding[,] right wrist bones are protruding," can only reasonably be interpreted as referencing a bulge in Villeda-Morales's skin, not bones breaking through the skin. Med. Records at 18.

Particularly in light of these undisputed, objective x-ray results showing no breakage of the skin, the Court finds that Villeda-Morales's assertions in his ARPs do not create a genuine issue of material fact on the issue of deliberate indifference to a serious medical need. Where the medical records reflect frequent examinations by medical personnel, and the Medical Defendants readily provided medication, diagnostic testing, and physical therapy to treat Villeda-Morales's pain, no reasonable factfinder could conclude that Defendants acted with deliberate indifference to Villeda-Morales's medical needs. The Court will therefore grant summary judgment to the Medical Defendants on the Eighth Amendment claim.

For the same reasons, Defendants Bonner, Memar, and Hihueba, to the extent they could be identified, would have been entitled to summary judgment had they been served with process, such that the claims against these Defendants will be dismissed. Because Defendants are

entitled to summary judgment on liability, the Court need not address whether Villeda-Morales has made a viable claim for punitive damages.

Although the Court finds no constitutional violations, it trusts that medical personnel assigned to treat Villeda-Morales will take all necessary steps to ensure that Villeda-Morales receives the treatment needed not only to comply with the minimum requirements of the Constitution, but also to address his chronic pain as effectively as possible.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment is GRANTED. Villeda-Morales's Motion for Appointment of Counsel is DENIED. A separate Order shall issue.

Date: March 13, 2018

THEODORE D. CHUANG
United States District Judge